# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

### Appellant's Motion to Extend Time to File His Opening Brief

**THOMAS PATRICK CLAEYS**

Plaintiff/Appellant,

v.

**CHRISTIAN MOHR, et al.,**

Defendants/Appellees

Case No. 16-1285

_____

### On Appeal from the United States District Court
### District of Colorado
### The Honorable Craig B. Shaffer
### Civil Action No. 1:14-cv-01174-CBS
_____

### PLAINTIFFS' /APPELLANTS' OPENING BRIEF
_____

**Respectfully Submitted by:**
James D. Thorburn
THE LAW OFFICE OF JAMES D. THORBURN, LLC
5460 South Quebec Street, Suite 310
Greenwood Village, CO 80111
Telephone: (303) 646-3482; Facsimile: (303) 325-3489
E-Mail: jdt@thorburnlaw.com

### STATEMENT AS TO ORAL ARGUMENTS:
Oral argument is requested

### NOTICE OF ATTACHMENT:
Documents attached are scanned PDF Format

0

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………...…2

    Cases………………………………………………………….…......2

    Statutes…………………………………………………………….3

    Other Authorities…………………………………………….…..…3

PRIOR OR RELATED APPEALS …………………………..………….....3

STATEMENT OF JURISDICTION……………………………….…..…….4

ISSUES PRESENTED FOR REVIEW…………………………………..….7

STATEMENT OF THE CASE………………………………………….…7

STATEMENT OF THE FACTS……………………………………………9

SUMMARY OF ARGUMENT……………………………………...………11

ARGUMENT……………………………………………………………12

    A.     STANDARD OF REVIEW…….……………...................................17

    B.    THE LOWER COURT ERRED BY WEIGHING THE DISPUTED PREDICATE FACTS. ……………………………………………...18

    C.    APPELLEES' CREATION, REVIEW AND APPROVAL FOR SUBMISSIONTHE ARREST AND SEARCH WARRANTS VIOLATED THE APPELLANT'S CONSTITUTIONAL RIGHTS……19

    D.    THE STATEMENTS MADE BY SHEELEY AND INCLUDED

1

IN THE AFFIDAVIT WERE
FALSE…………………………………………………………………..20

E.    MOHR AND WOOLF OMITTED FROM THE AFFIDAVIT THAT
PROMISES OF LENIENCY WERE USED IN OBTAINING SHEELEY'S
CONFESSION…………………………………………………………..24

F.    MOHR AND WOOLF'S PROMISES TO GO TO THE DA IN RETURN
FOR SHEELEY'S TESTIMONY WERE IMPROPER PROMISES OF
LENIENCY……………………………………………………………26

G.    THE AFFIDAVITS FAILED TO INCLUDE THE EYE WITNESS
TESTIMONY OF TOMMY HINES……………………………………26

H.    THE PURPORTED REVIEW OF THE AFFIDAVITS BY DEPUTY
DA'S DOES NOT HELP THE DEFENDANTS' CAUSE……………..27

I.    WOOLF PERSONALLY PARTICIPATED IN THE
UNCONSTITUTIONAL ACTIVITY…………………………………..28

J.    MOHR AND WOOLF SHOULD HAVE PROVIDED THE COURT THE
FACT THAT SHEELEY WAS CONSIDERED A CO-CONSPIRATOR AND
WAS ALSO BEING CHARGED WITH THE MURDER.

K.    IT IS CLEARLY ESTABLISHED THAT THE CONFESSION
BROUGHT ABOUT BY PROMISES OF LENIENCY VIOLATED
CLAEYS' CONSTITUTIONAL
RIGHTS…………………………………………………………25

L.    THE AFFIDAVITS WITHOUT THE COERCED CONFESSION AND
MATERIAL OMISSIONS LACK PROBABLE
CAUSE………………………….....  26

M. PROBABLE CAUSE FOR ARREST IS NO DIFFERENT THAN PROBABLE
CAUSE FOR SEARCH…………………………………………………..27

CONCLUSION……………………………………………………………….27

RELIEF SOUGHT…………………………………………………..…………27

STATEMENT OF COUNSEL REGARDING ORAL ARGUMENT………………… 28

CERTIFICATE OF COMPLIANCE…………………………………………….……29

CERTIFICATE OF DIGITAL SUBMISSION…………………………………………29

CERTIFICATE OF SERVICE……………………………………………….…………..30

## TABLE OF AUTHORITIES

### CASES

*Carley v. Tkach,* 2008 U.S. Dist. Lexis 6691 (D. NJ 2008)………………………...18

*Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997)……………………..20, 25

*CitiMortgage, Inc. v. Am. Title Servs. Co.,* 2012 U.S. Dist. LEXIS 100865  (D. Colo. 2012)……27

*Griffin v. Strong,* 983 F.2d 1540, 1541 (10th. Cir. 1993)……………….……….16, 17

*Denver Justice and Peace Comm. v. City of Golden,* 405 F.3d 923 (10th Cir. 2005)...27

*Grubbs v. Bailes,* 445 F.3d 1275, 1278 (10th Cir. 2006)…………………………….18

*Lennon v. Sharon Hill Borough*, 2014 U.S. Dist. Lexis 49578 (E.D. PA 2014)………18

*Malley v. Briggs*, 475 U.S. 335, 343 (1986)………………………………………………18

*Ott v. City of Milwaukee,*  2014 U.S. Dist. Lexis 132649, p. 24 (E.D. WI 2014)…….24

*Poolaw v. Marcantel,* 565 F.3d 721, 730 (10th Cir. 2009)……… …..……………..26

*Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)…………………………17

*Schanzenbach v. Town of Opal, Wyo*., 706 F.3d 1269, 1272 (10th Cir. 2013)………..16

*Sherwood v. Mulvihill*, 113 F.3d 396 (10th Cir. 1997)…………………………………18

*Smith v. Matos,* 506 Fed. Appx. 894, n. 3 (11th Cir. 2013)……………………………18

*Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)……………………….………24

*Stewart v. Donges,* 915 F.2d 572, 582-83 (10th Cir. 1990)……….……………..……..18

*Stonecipher v. Valles,* 759 F.3d 1134 (10th Cir. 2014)…………………………………18

*Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009)………………..18

*United States v. Gentry*, 406 Fed. Appx. 274 (10th Cir. 2010)………………………….25

## STATUTES

28 U.S.C. § 1291…………………………………………………………………....4

28 U.S.C. §1331………………………………………………………………….…4

28 U.S.C. §1391……………………………………………………………………..4

## OTHER AUTHORIITES

## PRIOR OR RELATED CASES

None

## STATEMENT OF JURISDICTION

*District Court:* This action arises under the Constitution of the United States and the laws of the United States. This Court has subject matter jurisdiction over this matter under 28

U.S.C. §1331.  Venue is proper under 28 U.S.C. §1391 since a substantial part of the events or omissions giving rise to the claim occurred within this district.

   *Court of Appeals:*     This action is an appeal from a final order for dismissal from the United States District Court for the District of Colorado, in Civil Action No. 1:14-cv-01174, by Magistrate Judge Craig B. Shaffer who took full jurisdiction of the case by agreement of the parties. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.  Did the District Court err in its Order of Dismissal by ruling on the facts that the search warrant and the arrest warrant were supported by probable cause at the time they were executed?

2.  Did the District Court err in its Order of Dismissal by ruling that Claeys did not establish any violation of his constitutional rights?

3.  Did the District Court err in its Order of Dismissal by ruling that Defendants Mohr and Woolf are entitled to qualified immunity?

4.  Did the District Court err in its Order of Dismissal by ruling that there is no disputed issue of material fact and then subsequently weighing the evidence to determine the truth of the matter?

## STATEMENT OF CASE

This is an appeal of a dismissal of Mr. Claey's action against two officers for violation of his constitutional rights.  Mr. Claeys was arrested and charged for murder and kidnapping based upon a false confession which was extracted by the Appellees from the real murderer, Shawn Sheeley.  Based upon the same assertions by Shawn Sheeley, Appellees Mohr and Woolf issued an affidavit which resulted in a search of Claeys' home that caused substantial damage to the home.

The Appellees filed a motion for summary judgment claiming that they had qualified immunity for extracting the false confession.  The lower court, after extensively analyzing and weighing the disputed facts presented by both sides, made factual findings and concluded the false confession extracted by Appellees Mohr and Woolf did not violate Mr. Claeys' constitutional rights.   In order to arrive at its conclusions, the lower court weighed the disputed facts presented by the parties, made determinations of weight of evidence, including how much weight to give the expert testimony proffered by Mr. Claeys.

As will be discussed further, below, the lower court should not have engaged in analysis and characterization of the facts in arriving at its conclusion that no rights were violated.  The facts should have been reviewed by a jury and only then be looked at from the legal perspective.

## STATEMENT OF FACTS

The Plaintiff/Appellant, Thomas Patrick Claeys ("Tom Claeys"), at all times pertinent hereto was a resident of Elbert County, Colorado.  Specifically, his address was and is 30988 Magic Dog Circle, Kiowa, Colorado 80117.

In the 2008-09 timeframe, Claeys became romantically involved with Keta Crall ("Keta").  Keta had two sons, Conrad Crall and Auston Soucey.   The romance with Keta ended in late 2009.   See Declaration Tom Claeys attached hereto, Appx, Volume 5, p.1267.

In March of 2010, the house in which Keta, Conrad and Auston lived was foreclosed upon and they had to move.  Keta moved an old mobile home trailer on Claeys' property.  Tom Claeys was not aware of this action until the mobile home had already been moved onto the property.  To say the least, he was not happy with this unilateral action by Keta.  However, Keta, Conrad, and Auston lived in the trailer on Claey's property for several months.  *Id.*

The relationship among Tom Claeys, Keta, Conrad and Auston continued to deteriorate until finally Tom Claeys took legal action to remove them from his property and his life.  He sought and obtained protection orders against Keta and Conrad.  See See Exhibit 1. In addition, Tom Claeys filed a forcible entry and detainer action against them to have them evicted from his property and so he could remove the trailer.   Conrad moved from Tom Claeys property in early August 2010 and Claeys did not see nor have any

contact Conrad after that time.  See Declaration of Tom Claeys, ¶5, Appx, Volume 5, p.1268.

On or about September 20, 2010, Conrad Crall was murdered by Shawn Sheeley. According to Eric Garcia, a friend of Sheeley.  Conrad had stolen the purse of Sheeley's sister.  Sheeley murdered Conrad in retaliation for his stealing the purse.  See Exhibit 3, Appx, Volume 3, p.596.

Sheeley found an acquaintance, Jesus Reyna, to assist him in the murder.  Reyna's street name is "Sleepy".  Sheeley contacted Conrad and invited him to go to the mountains to shoot guns that Sheeley had.  Conrad agreed, and they met at Colorado Boulevard and 40th Ave. Reyes drove them to the mountains on I-70.  They found an isolated location outside of Georgetown, CO, stopped, got out, and walked up the mountain.  At this point, Sheeley turned a gun on Conrad and shot him.  Conrad began to run, and Reyes shot Conrad several times.  Conrad fell.  While Conrad was down, Sheeley finished the job by shooting Conrad in the head with a sawed off shotgun at point blank range.  See Exhibit 4, Appx, Volume 3, p. 643 – 644.

Sheeley subsequently admitted to Garcia that he had murdered somebody in the mountains.  However, Sheeley did not disclose who the person was.  Garcia thought Sheeley was lying but began to believe him when Garcia heard the news reports about Conrad being found murdered.  See Exhibit 3, Appx, Volume 3, p. 614.

A couple weeks later, Conrad's body was found and a murder investigation ensued. Detective Jim Woolf of the Clear Creek County Sheriff's Office led the investigation. In the early part of the investigation, Detective Woolf interviewed Keta and Auston. He asked who they thought may have murdered Conrad. They both speculated that Tom Claeys had murdered Conrad. They had nothing linking Claeys to the murder. Rather, it was the deteriorated relationship they had which caused this speculation. See Exhibit 5, Appx, Volume 3, p. 658. As a result of this interview, the entire ensuing investigation focused on Tom Claeys as the prime suspect.

The investigation continued for over a year and Detective Woolf could not find anything to bring charges against Claeys. See Deposition of Christian Mohr, Exhibit 6, Appx, Volume 3, p. 678. The case went cold. In February of 2012, Detective Woolf sought the help of the Colorado Bureau of Investigation. Christian Mohr was assigned to the case for CBI. Detective Mohr was inexperienced in homicide investigations only previously investigating one true homicide in his career. See Exhibit 6, Appx, Volume 3, p. 700-702.

The investigation with Detective Mohr uncovered that the telephone pinging of Sheeley's phone followed Conrad's phone up to the site of the murder and then back down to Denver. As a result Mohr and Woolf suspected that Sheeley was involved in the murder and decided to interview him. The interview happened on April 24, 2012. See Exhibit 11.

Detective Mohr began the interview with Sheeley.   Detective Woolf was present for the interview and listened to Mohr's questioning from an adjoining room that had a video monitor and speakers.  See Exhibit 11, Appx, Volume 3, p. 903.

Detective Mohr understood how the criminal mind worked.  He understood that Sheeley was involved in the murder given Sheeley's proximity to Conrad's phone at the time of the murder.  He also understood that as the questioning became more intense that Sheeley would find ways to minimize his involvement in Conrad's murder.  Specifically Mohr stated:

> "So as -- as you look at what [Sheeley] had discussed with me, he provided many different explanations and as you watch these guys, it's really interesting, watching anybody that you're interviewing that you're very sure has done something because they're -- the wheels are racing; right?  The wheels are racing. Okay. How do I get out of this? How do I get out of this? How do I get out of this? And I feed him something that kind of puts him back into a corner with this interview in the sense, Well, I know your phone has gone up there and I know you had possession of that phone. So okay, how do I get out of it?"

Exhibit 6, Appx, Volume 3, p. 729 ll. 4-16.

Thus, Mohr knew and understood that Sheeley would be looking for an out to minimize his liability as the questioning got more intense.   As demonstrated in the interview with Sheely, below, Mohr decided to give Sheeley the out.   Mohr set up the stage in Sheeley's mind that Mohr believed that Tom Claeys was the mastermind of the

murder of Conrad.  Mohr convinced Sheeley that if someone else, namely Claeys, could

be implicated as the mastermind of the murder, Sheeley would receive a lighter sentence.

As the interview progressed, rather than focusing on Sheeley's actions and getting

him to confess to the murder, Detective Mohr began to set the stage that they knew Tom

Claeys was the mastermind of the murder and that Sheeley an unwitting accomplice to

Claeys.   Mohr began by stating to Sheeley:

> Now, because I don't think that--before I--before I start explaining this, I
> don't think you're-- you're any sort of bad dude. . . . But I think you got
> caught up in some bad sh**, some really bad sh** because you were out of a
> job, because you didn't have any sort of way to live or anything else like that.
> . . And you got caught up in some bad sh** with Tom Claeys.

Exhibit 11, Appx, Volume 4, p. 1032, ll. 8-20.

Mohr continued to create the impression that they believed Claeys was the mastermind

and committed the murder.  Mohr stated:

> --what do you think Tom Claeys is covering for his ass right now and for
> Veronica Valentine are saying to us?

Exhibit 11, Appx, Volume 4, p. 1034, ll. 4-6.

> Okay. So I'm going to be--I'm going to be straight with you, okay, what if I
> was--what if I was (inaudible) very clearly that I have enough to pursue you
> in a murder conspiracy?

Exhibit 11, Appx, Volume 4, p. 1035-1036, ll. 24-25, 1-2.

And what if I was to tell you to that it's not just that you're being (inaudible) on, you're being labeled as the dude. . . Not just--not just--not just a guy that was helping out but the dude.

Exhibit 11, Appx, Volume 4, p. 1036, ll. 7-12.

Okay. Well, I'm telling you this is-- this is--this is me giving you my word-- my word that I don't think you were the one orchestrated--orchestrated this thing. I don't think that you were the one that--that said this is what we need to do. I don't think you even necessarily knew the guy that's what I think. But I don't think that I can go any forward with this[1] or anything else like that if you just tell me no when I have the phone records documenting that you talked to your mom after this. And I--just--just listen--just listen to me before I--documented and I have people telling me--not only--not only but-- do I have people telling me that you were involved but the description of the weapon that you had. Not only do I have that, I have your phone pinging as it goes up --it meets up with this person. . .

The phones meet around right around I-70, your phone up in the mountains. Exactly when this person [Conrad Crall] disappears it goes back down.

Tom he didn't remember--he didn't remember his phone so he's going to try to skate; he's going to try to skate on this completely. I'm not talking about because of maybe, because of possibly, because he wants to pin it on you 100 percent.

Exhibit 11, Appx, Volume 4, p. 1038, l. 1-7.

[Claeys] says--he says Shawn is the mastermind of this thing. And then we talked to Veronica and we talked to other people that said yeah, he talked about this thing. But you know what they tell me, they tell me, Shawn is somebody that was involved but they're not sure--they can't see that he'd be the mastermind of this thing; that he'd be the one that's cold blooded like that; he's not the mastermind of this thing. . . But [Claeys] he says--he's the only witness. . .

So what I'm saying-- is you can play it--complete dumb on me or you can actually tell me what the hell went on because I don't believe that sh** for a

---

[1] The undersigned interprets this statement as Mohr suggesting that he can reduce Sheeley's charges or sentence.

second that you were the mastermind of this thing, but I do know you were there. I do know you were there.

Thus, Mohr set the stage for Sheeley that Mohr believed that Claeys was at the scene of the crime and was the mastermind. However, Mohr went a step further. If Sheeley did not implicate Claeys as the mastermind, Sheeley would be tried as the mastermind. Mohr impressed upon Sheeley that the "mastermind" meaning the one "who thinks the thing up" and plans the murder is the one who "get hammered" meaning that the mastermind gets the longest prison sentence. See Exhibit 11, Appx, Volume 4, p. 1044. Mohr made it very clear to Sheeley:

> [B]ut you've got to believe me man, it was him [Claeys] --because that's-- that's the guy that really gets the hammer to the thing, right, is the guy that-- is the guy that thinks this thing up and says hey we've got to go do this to this guy; that's the guy that really gets hammered for this thing.

Exhibit 11, Appx, Volume 4, p. 1044, ll. 10-15.

After all this setup, Mohr asked Sheeley:

> So when I--that's all I'm saying. What--what can you give me, Shawn, what can you give me, what can you throw a bone to me that you weren't the mastermind of this, buddy, that this was not something that Shawn Sheeley thought up.

Exhibit 11, Appx, Volume 4, p. 1044, ll. 15-18

At that point seeing that Sheeley had a chance to get a lesser sentence, Sheeley took the "out" provided by Mohr began to implicate Claeys in the murder of Conrad.

13

Detective Mohr had already set the table for Sheeley to implicate Claeys as the

mastermind.  Mohr was quite explicit to Sheeley that Mohr believed Claeys was the

mastermind.  Mohr gave Sheeley every out to implicate Claeys in the murder.  Of course,

Sheeley knew the details of the crime because Sheeley was the mastermind of the murder.

 It was really easy for Sheeley to include details of the crime to make a believable story –

Sheeley was the murderer.  However, setting details of how Claeys was involved proved

more problematic for Sheeley.

Sheeley began by stating that Claeys wanted Conrad dead.  He added that there

were two other men involved in the murder brought by Claeys.  Sheeley claimed that he

and Claeys waited in the car while the other two men murdered Conrad.  See Generally

Exhibit 11, Volume 4, p. 1086-2007.

However, a story which did not have Claeys actually committing the murder was

not sufficient for Mohr.  He needed to have a story where Claeys pulled the trigger.  After

Mohr failing to get a story which suited his purposes, he promised Sheeley:

> [I]t's time to come clean and I think it's going to help you. But I don't know,
> it depends on what you tell me.  I can't--you know, I can't guarantee
> anything**. Except for I do know one thing.  Is if you come clean with this
> story, I can approach the DA's office, okay**. (Emphasis added)


Exhibit 11, Appx, Volume 4, p. 1065, ll. 8-13.

After a long set up, and placing in Sheeley's head that he can get more lenient treatment if he can implicate Claeys as the mastermind, Mohr promised to go to the DA and get lenient treatment if Sheeley "would come clean with this story".

Mohr wanted a story that more directly implicated Claeys as the murderer. Sheeley complied. Sheeley took the details of what Sheeley did to Conrad and stated that it was Claeys who took those actions. After several variations of the story of how Claeys murdered Conrad, Mohr and Woolf were satisfied with story as currently being told by Sheeley.

Later in the interview, Detective Woolf took over the questioning. Since Sheeley made the satisfactory statements to Mohr, Woolf told Sheeley:

> "Because what Christian was telling you, is I'm going to go to boot for you with the DA's office as long as you're willing to be my friend-- and testify— [against Claeys]."

Exhibit 11, Appx, Volume 4, p. 1103.

In return for this promise, Sheeley wrote a statement implicating Claeys and signed it. See Exhibit 14, Appx, Volume 4, p.1155.

Mohr was aware of the problems with Sheeley's veracity. In his CBI report he expressed concerns about the multiple conflicting stories Sheeley gave, but claimed he was satisfied with the final story. See Exhibit 7, Appx, Volume 4, p. 881-885, Mohr Notes on Sheeley Interview. These concerns were never presented to the magistrates in the arrest and search affidavits.

15

Mohr and Woolf had no evidence corroborating Sheeley's statements about Claeys

involvement in the murder.   They had questions about Sheeley's veracity.  Importantly,

"facts" as stated by Sheeley did not line up with in the information given to them by the

only third party eye witness Tommy Hines.

Mr. Hines was working on his RV at Shiloh Temple the afternoon of September 20,

2010.  Mr. Hines saw a Maroon Ford Pickup truck (Conrad's Vehicle) and a white four

door sedan pull into the Shiloh Temple parking lot between 2:00 and 3:00 p.m.

According to detective Woolf's notes, Mr. Hines was "adamant" about the time in which

the transaction occurred.   He saw Conrad get out of the truck and voluntarily walk and

get into the white car – which did not match the description of Claeys car.   Mr. Hines said

nothing about Conrad being held at gunpoint.   Also Hines description of the people there

did not match the description of Mr. Claeys.  See Exhibit 18, Volume 5, p. 1179.

DNA evidence was obtained from the crime scene.  However, Mohr and Woolf did

not take any actions to obtain Claeys' DNA and see whether his DNA matched that at the

crime scene pre-arrest.  After arrest, Claeys' DNA was taken and there was no match

found.   See Exhibit 6, Appx, Volume 3, p. 762-763.

However, despite conflicting facts, and a very shaky witness confession, Mohr and

Woolf were not going to waste any time getting charges filed against Claeys.   They were

always convinced that Claeys was the primary suspect even after it was found that he had

nothing to do with the murder.  See email for Mohr to Woolf, Exhibit 13, Appx, Volume 4, p. 1153-1154.

Mohr and Woolf agreed that Mohr would write the affidavits for arrest and search. Mohr wrote the affidavits on the evening of April 24, 2012 and had them reviewed by Woolf.  See Affidavits Exhibit 9 and 10, Appx, Volume 4, p. 887-902. See also, Exhibit 6, Appx, Volume 3, p. 759. By the morning of April 25, the affidavits were submitted to the Court and arrest and search warrants were issued.  Claeys was arrested and spent 90 days in jail for a crime he did not commit.

Mohr and Woolf subsequently filed an affidavit for arrest of Shawn Sheeley for the murder of Conrad.  See Exhibit 9, Affidavit for arrest.  The affidavit was substantially similar to the affidavit for arrest and search of Claeys.  However, the final page of the affidavit adds additional information to show the criminal culpability of Sheeley which was missing from the Claeys affidavit.

Despite the arrest, other detectives continued investigating the information provided by Eric Garcia, especially about the identity of "Sleepy".  Ultimately, "Sleepy" was found to be Jesus Reyna. See Exhibit 4, Appx, Volume 3, p. 610. Reyna was interviewed and consistent with the statements made to Eric Garcia, Reyna stated that it was he and Sheeley who committed the murder.  See Exhibit 4, Appx, Volume 3, p. 638. Claeys had no involvement in the murder.  Ultimately, Sheeley acknowledged that he lied to Mohr and Woolf about Claeys involvement in the murder.  See Exhibit 12, Sheeley's

Written Statement to the District Attorney, Appx, Volume 4, p. 1151-1152.   Claeys was

released and cleared of all wrongdoing.  See Exhibit 8, Appx, VColume 4, p. 885-886.

Sheeley and Reyna were charged and they pleaded guilty to 2nd degree murder.  See

Exhibits 15 and 16, Shawn Sheeley Guilty Plea and Waiver of Rights, and Jesus Reyna

Guilty Plea and Waiver of Rights, Appx, Volume 4, p. 1156-1165.


## SUMMARY OF ARGUMENT

The District Court erred in its Order and Opinion Granting Defendants' Motions for

Summary Judgment by ruling, as a matter of fact rather than law, that Mohr and Woolf

were entitled to qualified immunity.  The lower court extensively analyzed the facts and

arrived at its own conclusion, never analyzing whether a reasonable juror could conclude

otherwise.  The lower court was not the finder of fact, and should not have entered the

order based upon factual findings.  While the question of voluntariness of a confession is a

question of law, the "factual predicates" that lead to that ultimate question are not.  *Griffin

v. Strong*, 983 F.2d 1540, 1541 (10th. Cir. 1993).   The facts which lead to the lower

court's conclusion were disputed issues.  Thus, the court erred in ruling as a matter of law

that Sheeley's false "confession" was voluntary.

## ARGUMENT

### A.    STANDARD OF REVIEW.

The Court should review *de novo* a district court's order granting summary

judgment, "applying the same standards that the district court should have applied."

*Schanzenbach v. Town of Opal, Wyo.*, 706 F.3d 1269, 1272 (10th Cir. 2013) (internal

quotation marks omitted). "Summary judgment is appropriate if the pleadings and the

record establish that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law." *Id.*

      With respect to qualified immunity: "When a defendant asserts qualified immunity

at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in

order to defeat the defendant's motion.  The plaintiff must demonstrate on the facts alleged

both that the defendant violated his constitutional or statutory rights, and that the right was

clearly established at the time of the alleged unlawful activity." *Riggins v. Goodman*, 572

F.3d 1101, 1107 (10th Cir. 2009).   However, in determining whether the plaintiff has met

its burden of establishing a constitutional violation that was clearly established, the Court

must construe the facts in the light most favorable to the plaintiff as the nonmoving party.

*Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

      While the question of voluntariness of a confession is a question of law, the "factual

predicates" that lead to that ultimate question are not.  *Griffin v. Strong*, 983 F.2d 1540,

1541 (10th. Cir. 1993).   When the factual predicates are in dispute, such as here, those

questions should be submitted to the jury and not determined in a summary manner.  *Id.*

**B.**      **THE LOWER COURT ERRED BY WEIGHING THE DISPUTED**

           **PREDICATE FACTS.**

There were numerous disputed facts presented by the parties which the lower court

had to weigh in order to grant summary judgment.  The lower court had to weigh the

importance of various evidence, e.g., the statements made by eye witness Tommy Hines.

The court concluded that "Under this timeline, Conrad was abducted later than suggested

by Mr. Hines.  Mr. Hines' statements would not be dispositive of the issues, and would

not outweigh Sheeley's inculpatory statements." See Order, p. 19, Appx.,Volume 5, p.

1306. It is clear that the lower court was weighing the evidence – something that should

not have been done by the court in a motion for summary judgment.     The lower court

weighed evidence throughout its order.  This was improper.  These are questions that

should have gone to the jury, not disposed of the lower court is a summary fashion.

### C.     APPELLEES' CREATION, REVIEW AND APPROVAL FOR SUBMISSIONTHE ARREST AND SEARCH WARRANTS VIOLATED THE APPELLANT'S CONSTITUTIONAL RIGHTS.

It is a "clearly established" violation of a plaintiff's Fourth and Fourteenth

Amendment rights to knowingly or recklessly make misstatements, or omit from a search

or arrest affidavit information which, if included, would have vitiated probable cause.

*Stewart v. Donges,* 915 F.2d 572, 582-83 (10th Cir. 1990).   When applied to an

affirmative misstatement, this is known as a *Franks* claim; and when applied to a material

omission, it is referred to as a *Reverse-Franks* claim.  See *Smith v. Matos,* 506 Fed. Appx.

894, n. 3 (11th Cir. 2013).

*Franks* and *Reverse-Franks* have been applied in Section 1983 claims sounding in

malicious prosecution, false arrest/imprisonment and unlawful searches, see *Stonecipher*

*v. Valles,* 759 F.3d 1134 (10th Cir. 2014)("Officers must have probable cause to initiate a search, arrest, and prosecution under the *Fourth Amendment."); Sherwood v. Mulvihill,* 113 F.3d 396 (10th Cir. 1997)(applying *Franks* to a search warrant); see also, *Grubbs v. Bailes,* 445 F.3d 1275, 1278 (10th Cir. 2006)(false arrest, malicious prosecution); (*Sherwood v. Mulvihill,* 113 F.3d 396, 400 (3rd. Cir. 1997)(unlawful search); *Lennon v. Sharon Hill Borough*, 2014 U.S. dist. Lexis 49578 (E.D. PA 2014)(false imprisonment/arrest); *Carley v. Tkach,* 2008 U.S. Dist. Lexis 6691 (D. NJ 2008)(false arrest).

A law enforcement officer has a duty to refrain from obtaining an arrest or search warrant without probable cause. A Section 1983 claim is established when it is shown a law enforcement officer obtained a warrant without probable cause. *Malley v. Briggs*, 475 U.S. 335, 343 (1986).

> "[A]n officer who knows that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause. But such reflection is desirable, because it reduces the likelihood that the officer's request for a warrant will be premature. Premature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests, which may injure the innocent or, by giving the basis for a suppression motion, benefit the guilty."

*Malley,* 475 U.S. at 343.

### D.    THE STATEMENTS MADE BY SHEELEY AND INCLUDED IN THE AFFIDAVIT WERE FALSE.

There is no question at this point that the statements made by Sheeley in the interview and included in the Affidavits by Mohr and Woolf were false. Sheeley even acknowledges that he lied to Mohr because he was "scared" that Mohr would think Sheeley was a "bad person". See Exhibit 12. These statements by Sheeley were necessary to establish probable cause in the Affidavits. Mohr acknowledges that without Sheeley's statements the Affidavits do not provide probable cause to arrest Claeys or search his home. See Exhibit 6, p. 89, ll. 8-18. Thus, the false statements by Sheeley were the necessary and critical components to create probable cause in the Affidavits. There is at least a question of fact precluding summary judgment on these issues.

### E.      MOHR AND WOOLF OMITTED FROM THE AFFIDAVIT THAT PROMISES OF LENIENCY WERE USED IN OBTAINING SHEELEY'S CONFESSION.

It has been clearly established since no later than 1997 that confessions by a witness implicating the defendant, brought about through promises of leniency, violate the defendant's constitutional rights. *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997). Such a coerced confession when used in an arrest affidavit can the basis for a Section 1983 claim. *Id.* [2]

---

2 Mohr and Woolf asserted that Claeys does not have standing to assert Sheeley's coerced confession as the basis for the constitutional violation. However, the lower court correctly rejected this argument. The Tenth Circuit has rejected this argument. *Clanton v. Cooper,* 129 F.3d at 1157 (Before discussing the coercion issue, however, we must determine whether Clanton may contest the voluntariness of Eaves's confession. We conclude that she may. . . Clanton may contest the voluntariness of Eaves's confession not based on any violation of his constitutional rights, but rather as a violation of her own Fourteenth Amendment right to due process).

It is improper for the investigating officer to infer in any way that the interviewee "would get off lightly" if he was to confess to a pattern of events suggested by the investigator.  *Id.* at 1158.  The *Clanton* Court acknowledged that officers lying about facts to the interviewee can be tolerated.  However, "courts are much less likely to tolerate misrepresentations of law."  *Id.* at 1158, quoting 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.2, at 446-47 (1984).

Mohr's statements that Sheeley would get "really hammered" if he was the "mastermind" were clearly designed to convey to Sheeley that the "mastermind" would receive a more severe prison sentence than the one who was not the mastermind.   Thus, Mohr's misrepresentations were misrepresentations of law.  Mohr was clear why he used this relative guilt message on Sheeley:

THORBURN:  What do you mean a person is more guilty?

MOHR:  That's what I was trying to – I guess -- if you want to use the word lie or trick -- trick Sheeley into believing that there was one person that would have been more guilty, i.e. allowing him to have an out for his particular behaviors.

Exhibit 6, p. 62, ll. 9-15.

Thus, Mohr was trying to convey to Sheeley that not being the mastermind would give Sheeley an "out for his particular behaviors".  Mohr understood that he was conveying to Sheeley that he would receive a lighter prison sentence if he would implicate Claeys as the mastermind.  These actions are improper coercion and an improper promise

23

of leniency.  *Clanton, supra.*  The lower court extensively discounted Mohr's own testimony of the purpose of his questioning of Sheeley.  These are questions that should have been allowed to be decided by the jury, not summarily by the judge.

### F.     MOHR AND WOOLF'S PROMISES TO GO TO THE DA IN RETURN FOR SHEELEY'S TESTIMONY WERE IMPROPER PROMISES OF LENIENCY.

As discussed more thoroughly in the Facts section, Mohr promised Sheeley that he would go to the DA in return for "clean" testimony.   Exhibit 6, p. 163, ll. 8-13.  The clear import of Mohr's statement was that in return for the preferred statement of events, Mohr could get preferential treatment.  Woolf provided a similar promise when he said that he would "go to boot" for Sheeley with the DA since Sheeley provided the testimony for which Mohr was looking.

Plaintiff's expert Timothy T. Williams, Jr., discusses in detail how police officers are trained not to give promises in return for confessions.  Both Mohr and Woolf violated this basic rule.  See Exhibit 17, Expert Report of Timothy T. Williams, Jr., p. 5.

Given the above, the Plaintiff has made a *prima facia* case that improper promises of leniency were used to obtain Sheeley's false statements.  These false statements were used in the Affidavits and were instrumental in creating the impression of probable cause.  The lower court should not have analyzed disputed facts and determined the weight.  These facts should have gone to the jury.

### G.    THE AFFIDAVITS FAILED TO INCLUDE THE EYE WITNESS TESTIMONY OF TOMMY HINES.

Tommie Hines was the only third party eye witness to the events where Conrad and Sheeley met at Shiloh Temple and Conrad drove off with Sheeley. Hines was adamant that the transaction occurred between 2:00 and 3:00. See Exhibit 5, pp. 6-7. Also, Mr. Hines made no mention that Conrad was being held at gunpoint when he went to Sheeley's car. Also, Hines stated that Conrad got into a white car which did not meet the description of Claeys vehicle. *Id.* As expert Timothy T. Williams observed, the omission of Hines' statements was a "critical omission". First, Hines' statements were contrary to Sheeley's statement. Second, Hines' statement of the time of the transaction made it impossible for Claeys to have been at the scene of the crime. The telephone transaction between Claeys and Sheeley ended at 1:58 p.m. September 20, 2010. Claeys asserts that in normal weekday traffic, it takes approximately 1 hour 45 minutes to get from his house to I-70 and Colorado Blvd., which would make it impossible for Claeys to be at the location at the time Hines stated the transaction occurred.

Even Mohr and Woolf's expert does not place Claeys within the eyewitness Hines' timeframe. Defendants' expert Dan Montgomery stated that it took 1 hour and 7 minutes to travel. However, he acknowledged that he made the trip on September 20, 2015 – which is a Sunday. September 20, 2010 (the date of the murder) was a Monday. It does not take much to realize that traffic in the city is considerably different on Sunday afternoon than Monday afternoon. Furthermore, Mr. Montgomery did not take into

consideration that Mr. Claeys property is large acreage and another 5 – 10 minutes needs to be added to the trip time.  See Declaration of Tom Claeys.

Thus, at the earliest, using Mr. Montgomery's times, Mr. Claeys could not have arrived at Shiloh Temple earlier than 3:05 – which is outside of the time frame of the eye witness Mr. Hines.  Adding the additional travel time from Mr. Claeys home to the street, would place his earliest arrival at 3:15 which is clearly outside of Mr. Hines' timeframe.  Further, taking Defendant Woolf's "Google" time estimates [Doc. 106-12] of taking between one hour and 19-24 minutes, Mr. Claeys's earliest arrival time is 3:30 or after, completely outside of Mr. Hines' eye witness observations.

Given the above, the failure to include the statements of the only third party eye witness to the transaction at Shiloh Temple (Tommie Hines) was material, and fell below any standard of care of a police officer.  These are disputed issues that should have been allowed to go to the jury.

### H.    THE PURPORTED REVIEW OF THE AFFIDAVITS BY DEPUTY DA'S DOES NOT HELP THE DEFENDANTS' CAUSE.

The purported review of the Affidavits by Deputy DA's does not help the Mohr and Woolf's  cause.  First, there is no documentation that in the less than 24 hour period from the time of the Sheeley interview to the time of the submission of the Affidavits, that any DA reviewed the Affidavits for accuracy.  See Exhibit 6, p. 95-96.  Second, there is nothing in any of the affidavits submitted by the Defendants, that the DA's reviewed the interview itself or any of the source documents.  Any review by a DA without the source

documents could not determine whether the statements stated by Mohr and Woolf were accurate.

## I.    WOOLF PERSONALLY PARTICIPATED IN THE UNCONSTITUTIONAL ACTIVITY.

The fact that Woolf did not sign the affidavit does not insulate him from liability. Jim Woolf was the lead investigator.   Exhibit 6, p. 15, ll. 17-19.  He, as lead investigator, should have been aware of all the information gathered during the investigation.  *Ott v. City of Milwaukee,*  2014 U.S. Dist. Lexis 132649, p. 24 (E.D. WI 2014).   He certainly was aware of the promises of leniency discussed above.  Woolf also personally participated in the promises of leniency to Sheeley.   Exhibit 11, p. 201, ll. 19-23.  Woolf personally reviewed and approved the Affidavits before submission and had final say as to all of the investigatory process.  Exhibit 6, p. 98, ll. 10-21.  Thus, Woolf was fully aware of the coerced confession and as lead investigator allowed these false affidavits to be submitted.

As the Tenth Circuit has stated:

> "Concerning a defendant acting in a non-supervisory capacity, there must be cause in fact between the conduct complained of and the constitutional deprivation. See *Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989); *Reimer v. Smith*, 663 F.2d 1316, 1322 n.4 (5th Cir. 1982); *Bennett  v. Passic,* 545 F.2d 1260, 1262-63 (10th Cir. 1976). But, as stated by the Seventh Circuit:

> "'For liability under section 1983, direct participation is not necessary. Any official who "causes" a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the

defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'"

*Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).

As stated above, Woolf, as lead investigator, reviewed and approved the affidavits for submission with complete knowledge of the unconstitutionally coerced witness confession.   He was also aware of the fact that Claeys was two hours away from the scene of the crime when it was committed.  Woolf certainly, by his approval for submission as lead investigator, set in motion a series of events that Woolf knew or reasonably should have known would cause others to deprive the plaintiff his constitutional rights.  *Id.*  Thus, the Plaintiff states a claim against Defendant Woolf.

### J.      MOHR AND WOOLF SHOULD HAVE PROVIDED THE COURT THE FACT THAT SHEELEY WAS CONSIDERED A CO-CONSPIRATOR AND WAS ALSO BEING CHARGED WITH THE MURDER.

Mohr and Woolf left out the fact that Sheeley was being charged as a co-conspirator in the murder of Conrad.   This is an important element for the Court to consider when determining whether the Affidavit has probable cause.  It is well known:

"Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law. This willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies, and double-crossing anyone with whom they come into contact, including the prosecutor. A drug addict can sell out his mother to get a deal, and burglars, robbers, murders, and thieves are not far behind. Criminals are

remarkably manipulative and skillfully devious. Many are outright conscienceless sociopaths to whom "truth" is a wholly meaningless concept. To some, "conning" people is a way of life. Others are just basically unstable people. A "reliable informant" one day may turn into a consummate prevaricator the next."

*The Use of a Criminal as a Witness, a Special Problem, Lecture Materials October 2007,* Stephen S. Trott, Senior Circuit Judge United States Court of Appeals for the Ninth Circuit

## K.    IT IS CLEARLY ESTABLISHED THAT THE CONFESSION BROUGHT ABOUT BY PROMISES OF LENIENCY VIOLATED CLAEYS' CONSTITUTIONAL RIGHTS.

As stated above, the confession by Sheeley implicating Claeys was brought about by promises of leniency by Mohr and Woolf.  Both were fully aware of the events of the interrogation and confession as they were both present for the entire interrogation.  Thus they both had knowledge of the event.  It has been clearly established since no later than 1997 that confessions by a witness implicating the defendant, brought about through promises of leniency, violate the defendant's constitutional rights.  *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997).  Such a coerced confession when used in an arrest affidavit can the basis for a Section 1983 claim.  *Id.*

## L.    THE AFFIDAVITS WITHOUT THE COERCED CONFESSION AND MATERIAL OMISSIONS LACK PROBABLE CAUSE.

In reviewing a *Franks* claim, the Court should review the affidavits, excise the material misstatements, and supply the material omissions to determine whether the

affidavits stated probable cause.   See, *United States v. Gentry*, 406 Fed. Appx. 274 (10th

Cir. 2010).

As acknowledged by Defendant Mohr, when Sheeley's confession is excised from

the Affidavits, there is no probable cause to either arrest Claeys or search his home.

When the other material omissions stated above are added, it becomes even more clear

that there is no probable cause in the Defendants' Affidavits.

### M.    PROBABLE CAUSE FOR ARREST IS NO DIFFERENT THAN PROBABLE CAUSE FOR SEARCH.

The analysis of probable cause for arrest is no different than probable cause for a

search.  *Poolaw v. Marcantel,* 565 F.3d 721, 730 (10th Cir. 2009).  Thus, the analysis

regarding the unlawful search will be the same.  *Id.*

For the reasons stated above, the vitiated probable cause in the search warrant

allows the Plaintiff to state a *Franks* claim for the search.

It also should be noted, that all Plaintiff has to show was that the search was

performed.  The plaintiff may recover all damages proximately caused by the unlawful

search.  While Defendant Woolf generally discussed that other officers may have caused

the damage, this goes to the foreseeability issue and whether the other officers actions

were an intervening event.    Intervening events are affirmative defenses.  It also should be

noted, that all Plaintiff has to show was that the search was performed.  The plaintiff may

recover all damages proximately caused by the unlawful search.  While Defendant Woolf

generally discussed that other officers may have cause the damage, this goes to the

foreseeability issue and whether the other officers actions were an intervening event.   An

intervening event is an affirmative defense.  *CitiMortgage, Inc. v. Am. Title Servs. Co.,*

2012 U.S. Dist. LEXIS 100865  (D. Colo. 2012).  Thus, the burden would be on the

Defendant to show the intervening event which has not been done.

Nevertheless, if the Plaintiff does not recover any actual damages, he will be

awarded nominal damages for the unlawful search.  See *Denver Justice and Peace Comm.*

*v. City of Golden,* 405 F.3d 923 (10th Cir. 2005).  Thus, it does not matter for purposes of

summary judgment whether or not there were damages associated with the unlawful

search.

## CONCLUSION

There were numerous issues of disputed fact that the lower court resolved on

summary judgment.  This is error.  There are numerous factual predicates that the lower

court should not have resolved on summary judgment.

## RELIEF SOUGHT

The Plaintiff/Appellant respectfully requests that this Court:

1.      Vacate District Court's June 8, 2016 Order dismissing

Plaintiffs'/Appellants' Complaint;

2.      Determine that there are questions of fact which preclude summary

judgment.

31

3.    Remand the matter to allow the case to proceed to a jury trial.

4.    Provide such other and further relief as the Court deems proper.

DATED THIS 3RD DAY OF OCTOBER, 2016.

THE LAW OFFICE OF JAMES D. THORBURN, LLC


By:  */s/ James D. Thorburn*
James D. Thorburn
The Law Office of James D. Thorburn, LLC
5460 South Quebec Street, Suite 310
Greenwood Village, CO 80111
(303) 646-3482
jdt@thorburnlaw.com

## STATEMENT OF COUNSEL REGARDING ORAL ARGUMENT

Oral argument is necessary and that the issues contained herein are complex and

oral argument will assist Court in understanding the full ramifications of its decision.

## CERTIFICATE OF COMPLIANCE

I certify that the total number of pages I am submitting as my Plaintiff's/Appellant's

Brief is 30 pages or less exclusive of the disclosure statement, the proof of service, and the

accompanying documents required by Rule 21(a)(2)(C) or is less than 14,000 words as is

required for an opening brief.  The undersigned further certifies that this brief is 7,838

words.


Dated:   October 3, 2016                 *s/ James D.  Thorburn*
                                            James D. Thorburn




## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that a copy of the foregoing Plaintiff's/Appellant's Brief, as
submitted in Digital Form via the court's ECF system, is an exact copy of the written
document filed with the Clerk and has been scanned for viruses with the Norton 360
Premier Version 22.5.2.15, updated to October 3, 2016 and, according to the program, is
free of viruses.  In addition, I certify all required privacy redactions have been made.


Dated:  October 3, 2016                 *s/ James D. Thorburn*
                                            James D. Thorburn

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2016, I served a copy of the Plaintiff/Appellant's

Opening Brief by serving it and all its attachments upon the U.S. District Court and the

following persons through the CM/ECF system in this case.

Kathleen Spalding
Patrick L. Sayas
1300 Broadway, 10th Floor
Denver, Colorado 80203
Kit.Spalding@state.co.us

Timothy Peter Schimberg
FOWLER, SCHIMBERG & FLANAGAN, P.C.
1640 Grant Street, Suite 150
Denver, Colorado 80203

*/s/ James D. Thorburn*

34